Louise CORLEY, Plaintiff,

v.

The HECHT COMPANY, et al., Defendants.

Civ. A. No. 79–2474.

United States District Court, District of Columbia.

Jan. 18, 1982.

**1156**

Barry S. Slevin, Washington, D. C., for plaintiff.

Donna Kohansky, Covington & Burling, Washington, D. C., for defendants.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

The question presented in this proceeding is whether an employer serving as the fiduciary of an employee benefit group life insurance plan (Plan) violates its fiduciary duties by using dividends from the Plan to recoup voluntary contributions to the Plan made by him. The plaintiff, Louise Corley, alleges that her employer, The Hecht Company, and the parent company, May Department Stores (May), have violated their fiduciary obligations imposed by common law and the Employee Retirement Income Security Act of 1974 (ERISA or the Act), 29 U.S.C. §§ 1001 *et seq.*, by using dividends from the Plan in this fashion. She further claims that May, which serves as administrator of and fiduciary for the Plan, violated various disclosure duties imposed by ERISA and the common law.

The plaintiff has moved for summary judgment on the several claims, seeking appointment of an independent trustee to administer the Plan, reimbursement of all dividends received by May plus interest,

punitive damages, and an order directing compliance with certain reporting requirements prescribed by the Act. The defendants have filed a cross-motion for judgment on the pleadings or summary judgment, arguing that the common law claims are time-barred, that plaintiff is without standing to assert them, and that, in any event, the applicable common law did not bar May from treating the dividends as it did. May further asserts that retention of the dividends as reimbursement for its own voluntary contributions to the Plan is permissible under the Act.

After consideration of the parties' memoranda of authority, the Court concludes that May violated neither the common law nor ERISA in obtaining reimbursement of the funds which it voluntarily contributed to the Plan. However, the Court does also find that May has not satisfied the Act's requirement that a fiduciary exercise care and diligence in handling of the plan assets. The Court further finds that May's description of the Plan furnished to the participants was misleading and thereby violative of the disclosure provisions of ERISA. In view of those findings May is barred from obtaining any future reimbursement; is ordered to remove itself as fiduciary of the Plan and to nominate a new administrator; and, is ordered to publish a new description of the Plan.

### Background

The principal material facts are not disputed. Defendant May is a retail department store operator incorporated in New York and headquartered in Missouri. The Hecht Company is an operating division of May. Plaintiff is a District of Columbia resident employed by the Hecht Company at one of its warehouses located in Maryland. In July 1973, she enrolled in the contributory group life insurance plan administered by May.

May established the Plan in 1966 with the Metropolitan Life Insurance Company (Metropolitan) serving as the insurance carrier. Employees obtained coverage by authorizing May to deduct premium payments from their paychecks. The payroll deductions were established to completely fund the insurance policy and May had no obligation to contribute toward payment of the premium. However, the aggregate employee contribution did not, in some years, equal the insurance premium and May advanced the needed monies.

The shortfall in payments arose for two reasons. First, the actual cost of insuring employees for a given year was determined by Metropolitan at the close of the year based on the actual mortality experience under the Plan for that year. Thus, in years in which experience under the policy was not favorable, Metropolitan required a retroactive premium payment to make up the difference between the annual premium that had been paid and the higher premium amount required after the year-end premium recalculation. May did not seek an additional payment from the employees but voluntarily made up the difference.

Second, premiums were "underwithheld" because of the formula by which May determined the amount of contributions required from participating employees. Metropolitan based its annual rates for employee contributions at a constant or flat rate regardless of age, and May did likewise from 1966 through mid-1973 in setting rates for employees. However, from mid-1973 to late 1977, May varied employee contribution amounts in order to provide younger employees with reduced rates. This "step-rated" contribution schedule resulted in lower aggregate employee premiums than Metropolitan charged under its flat rate schedule. The shortfall, or "underwithholding", was also met by voluntary direct payments from May to Metropolitan. In late 1977, Metropolitan likewise converted to the step-rated basis, and the underwithholding ceased.

While May filled the gap during a number of years between the annual premium charged by May and the employees' contributions, the result in other years was quite different. In some years, the employees' total contribution *exceeded* the cost of the insurance premium. This surplus—which the parties in this case have also called a

"dividend" or "refund"—was remitted to May.

The experience described above is summarized in the following table:

| Year Paid or Received | For Year | Underwithholding Advance Paid by May | Retro. Prem. Payment by May | Dividend Received by May |
|---|---|---|---|---|
| 1967 | 1966 | ---- | 0 | 11,568 |
| 1968 | 1967 | ---- | 76,441 | 0 |
| 1970 | 1968 | ---- | 227,618 | 0 |
| 1970 | 1969 | ---- | 262,103 | 0 |
| 1971 | 1970 | ---- | 0 | 1,153 |
| 1972 | 1971 | ---- | 125,733 | 0 |
| 1973 | 1972 | ---- | 0 | 397,807 |
| 1974 | 1973 | 71,433 | 0 | 2,739 |
| 1975 | 1974 | 156,110 | 0 | 50,957 |
| 1975 | 1975 | 152,789 | 0 | 0 |
| 1976 | 1975 | 0 | 0 | 301,628 |
| 1976 | 1976 | 91,768 | 0 | 0 |
| 1977 | 1976 | 0 | 0 | 94,530 |
| 1978 | 1977 | 16,014 | 0 | 16,634 |

For each of the refunds through 1977, May received a check from Metropolitan and deposited the money in a special bookkeeping account. By November 1977, May had not been fully reimbursed for its retroactive premium and underwithholding payments, with total company payments exceeding reimbursements by $302,993. Nevertheless, in that month, the company established a "rate stabilization reserve" account at Metropolitan with $342,197 of the dividend from 1976. Under the 1977 arrangement between May and Metropolitan which established the reserve account, Metropolitan ceased making retroactive premium refunds to May for the contributory life insurance policies but, rather, retains these monies and credits them to the rate stabilization reserve. Thus, under the arrangement currently in effect, May will no longer be reimbursed for any of its voluntary contributions to the Plan during 1967–1978.

### Legal Analysis

#### A. The Pre-ERISA Common Law Obligations of May

##### 1.

May contests the argument that it had a common law fiduciary obligation to use Plan dividends solely for the benefit of participating employees, arguing that its duties were purely contractual. May also contends that Corley's pre-ERISA (i.e., prior to January 1, 1975) common law claim is time-barred.

Under the District of Columbia statute of limitations, which governs this claim,[1] a contract action or an action for which no specific limitation is provided must be brought within three years of the time it accrues. D.C. Code § 12–301(7), (8). The right to maintain an action "accrues" when all the elements of the cause of action exist, *Freedman & Sons, Inc. v. Hartford Insurance Company*, 396 A.2d 195, 198 (D.C.App. 1978), which in this case was at the time May deposited any refund into its general funds. Since plaintiff's complaint for redress of these pre-1975 acts was filed with the Court in September 1979, the defendants argue that the claim is barred by the statute. Plaintiff responds that, since she is asserting an equitable right to redress the breach of a fiduciary duty rather than a contract claim, the question of a time bar is governed by the doctrine of laches.

■ Corley's common law claim should be time-barred even if it is equitable in

1. *See Steorts v. American Airlines, Inc.*, 647 F.2d 194, 196 (D.C.Cir.1981).

nature. While statutes of limitations do not control actions for equitable relief, *Holmberg v. Armbrecht*, 327 U.S. 392, 396, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946), the applicable statute is a guide in determining whether laches should permit a long-delayed claim to be enforced, *Saffron v. Department of the Navy*, 183 U.S.App.D.C. 45, 561 F.2d 938 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1033, 98 S.Ct. 765, 54 L.Ed.2d 780 (1978). Where plaintiff has not pursued her claim with diligence and the delay has prejudiced the defendant, laches will bar the action.

■ Corley has made no showing of due diligence in pursuing this action. And although she contends that May's practice of retaining the dividends for itself was fraudulently concealed from participating employees, May's annual reports[2] to the Department of Labor on the Plan disclose its receipt of dividends.[3] This information, coupled with plaintiff's knowledge that no benefits were directed to employees when these dividends were received, should have provided plaintiff with notice of May's practice. Moreover, if she had brought the breach claim in a timely fashion May could have altered the terms of its insurance coverage and minimized any damages for which it may now be liable. These factors indicate that defendants have been prejudiced by plaintiff's delay in bringing this action. Equally important, however, is the nature of plaintiff's request for reimbursement of past dividends. This is in the nature of a claim for legal relief and should be subject to the statute of limitations. *See Blankenship v. Boyle*, 329 F.Supp. 1089, 1112 (D.D.C.1971). Because any request for prospective equitable relief is completely redressable under ERISA, plaintiff's common law claim is barred by the statute of limitations.[4]

**2.**

■ Even if the statute of limitations does not bar the pre-ERISA claim, Corley's claim still could not succeed. The master contributory policy, which under the common law determines the extent and existence of May's duties with respect to the refunds, permitted reimbursement of May for its voluntary contributions. The relevant provision of the contract is Section 18, which states as follows:

*Participation in Divisible Surplus.* This policy is a participating contract and the Insurance Company shall annually ascertain and apportion any divisible surplus accruing under policies of this class. Any such divisible surplus apportioned to this Policy shall be paid in cash to the Employer or, upon written request from the Employer to the Insurance Company, shall be applied towards the payment of the aggregate of premiums next falling due under this Policy. In either event, in the case of Contributory Insurance, *an amount equal to the excess, if any, of the Employees aggregate contribution toward the cost of the insurance provided hereunder over the net cost of such insurance shall be distributed or applied by the Employer for the sole benefit of the Employees.* (Emphasis supplied).

The parties urge differing interpretations of the term "net cost" in the last sentence of Section 18. Corley contends that the net cost of the insurance must be an *annual* net cost, and thus May cannot offset its payment in one year with a refund in another year. May, on the other hand, argues that the determination of cost may be made on an *historical* basis, thus allowing May to look to refunds received in one year as reimbursements for the cost of retroactive

---

2. Such reports, containing statements of plan income and expenses and changes in net assets, are filed in accordance with section 103 of the Act, 29 U.S.C. § 1023. See 29 C.F.R. 2520.-103 1.

3. *See* Form D-2 for 1966, 1970 and 1972, the years a dividend was paid by Metropolitan. Defendants' exhibits 1, 5, 7.

4. May's claim that Corley lacks standing to bring an action on behalf of the plan is not supported by District of Columbia case law. *See Kennet v. United Mineworkers of America*, 183 F.Supp. 315, 317 (D.D.C.1960).

premium payments or underwithholding advances in other years. Consequently, in May's version, there is no excess over net cost until May has been completely reimbursed for its contributions to the Plan since 1967.

Although the question is close, the Court agrees with May. Had May and Metropolitan sought an *annual* net cost, they could have stated as much in the agreement, just as in the first sentence of the section Metropolitan is required to annually determine the extent of any surplus. Moreover, it is appropriate in determining the significance of this term to look to industry custom, and May submits convincing evidence that the industry custom is to entitle group policyholders to retain dividends and premium refunds to the full extent of their contributions. *See, e.g.,* 2 CCH Pension Plan Guide ¶ 6964 at 9620–21 (1979). Finally, both May and Metropolitan, the parties to the contract, understood that net cost would be determined on an historical basis and May further understood that the use of refunds to offset premium payments to Metropolitan constituted application of refunds "for the benefit of employees" within the meaning of Section 18.[5] The intent of the parties is, of course, most important in any interpretation of the contract. *See, e.g., Pennzoil Co. v. Federal Energy Regulatory Commission,* 645 F.2d 360 (5th Cir. 1981).

Thus, this Court concludes that May correctly determined that its contract with Metropolitan permitted it to obtain reimbursements for its advances to the Plan.[6]

### B. The Requirements Imposed By ERISA

#### 1.

ERISA is a broad remedial statute providing special protections for the interests of participants and beneficiaries of employee pension and welfare benefit plans, and imposing uniform standards for administering and for preserving the integrity of the plan assets.[7] *Eaves v. Penn,* 587 F.2d 453 (10th Cir. 1979); *Marshall v. Snyder,* 572 F.2d 894 (2nd Cir. 1978); *Marshall v. Davis,* 517 F.Supp. 551 (W.D.Mich.1981). *See generally, National Labor Relations Board v. Amax Coal Co.,* 453 U.S. 322, 332–33 n.14–16, 101 S.Ct. 2789, 2795 n.14–16, 69 L.Ed.2d 672 (1981). The Act imposes far-reaching standards governing the operation of these plans, including a set of "standards of conduct, responsibility, and obligation for fiduciaries" entrusted with management of the plans. § 2(b), 29 U.S.C. § 1001(b). In addition, there are very specific rules relating to transactions in which participation by plan fiduciaries is prohibited. § 406, 29 U.S.C. § 1106. Thus, while—as the preceding section of this opinion concluded—reimbursement of May was permissible under the common law, ERISA modified traditional trust law in a manner appropriate for employee benefit plans, *see Eaves, supra* at 457, and in the event of a conflict between the insurance policy agreement and ERISA, the federal law prevails. § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D); § 410(a), 29 U.S.C. § 1110(a).

■ The basic conflict between the two parties can be summarized as follows. Cor-

---

**5.** Babin Deposition 61–77 (April 11, 1980); Saunders Statement 29–30 (June 12, 1980).

**6.** Corley argues that under D.C. law, which she contends should apply here, the employer/administrator bears a fiduciary relation to the insured employees. May, on the other hand, contends that Missouri law applies here, and that under that state's law an employee covered under a contributory group policy cannot recover for refunds or dividends without showing either an express or implied contractual obligation on the part of the employer/policyholder to pay those refunds or dividends to the employee. Missouri law seems most appropriate in this case since all of the relevant acts—the application for insurance, negotiation of the

policy, its issuance, payment of the first premium, delivery of the policy—were performed or were effective in Missouri. In addition, the insurance policy explicitly states that Missouri law applies (Birlew Aff., Exh. 2, p. 19). Nevertheless, this Court need not decide this question because even if under the common law, May bore a fiduciary relation to the insured employees, that claim, as discussed above, is time-barred.

**7.** Contrary to May's contentions, ERISA explicitly conferred standing on plan participants, such as Corley, to obtain relief on behalf of the plan for breach of ERISA-created fiduciary duties. § 502(a)(2), 29 U.S.C. § 1132(a)(2).

ley views May's payments to the Plan as something akin to a donation, made, presumably, out of the company's desire to promote good employer-employee relations. Once the donations were made, May could not, without violating several provisions of the Act, "pocket" any monies which are later returned to the Plan. In particular, the plaintiff cites the general fiduciary provisions of § 403(c)(1), 29 U.S.C. § 1103(c)(1), which provides that the assets of an employee benefit plan "shall never inure to the benefit of the employer"; § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), which requires that a fiduciary discharge his duties solely for the benefit of the plan participants and beneficiaries; and § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), which imposes a duty of care, diligence, and prudence on the fiduciary in his handling of the plan assets. In addition, Mrs. Corley relies upon the prohibited transactions enumerated in § 406, 29 U.S.C. § 1106: subsection (a)(1)(D), which bars transfer of any Plan assets to a "party-in-interest"; subsection (b)(1), which prohibits a fiduciary from "deal[ing] with assets of the plan in his own interest or for his own account"; and subsection (b)(2), which bars a fiduciary from dealing in a transaction on behalf of a party whose interests are adverse to those of the Plan. These provisions, Corley argues, required that May use any refunds to either make a possible "premium holiday"—i.e., a waiver of paycheck withholdings until that portion of the dividend is used up in making subsequent monthly premium payments—or an increase in employee benefits.

May, unsurprisingly, views the situation quite differently. The money advanced during the years of retroactive premium payments and/or underwithholding was never intended as a "donation" but, May argues, was merely intended to sustain the fund during those years. Thus, May claims that reimbursement of the "refunds" or "dividends" was specifically permissible under various exceptions and exemptions of the Act.

The plaintiff's position is plausible only if the Act is construed in an excessively formalistic fashion. Because the factual setting of this case was apparently never contemplated by Congress in drafting the Act, and because the fiduciary obligations under the Act are so broad-reaching, the plaintiff urges upon this Court the notion that the Act performed a Jekyll and Hyde-type transformation of May. Instead of serving as the benevolent administrator of an employee insurance fund, voluntarily lending its own money interest-free, the company in Corley's view, operated in an overreaching, grasping, and callous manner in deliberate violation of federal law, thus warranting the imposition of punitive damages. The Court does not view the defendant in that light nor is there anything in the Act requiring such a re-characterization of the defendant.

For the prohibited transactions enumerated in § 406 of the Act, Congress also provided exceptions or exemptions for certain activities and it is under one such exculpatory provision that May's conduct was justified. Section 408(c)(2), 29 U.S.C. § 1108(c)(2), states that a fiduciary is not barred from "receiving any reasonable compensation for services rendered * * *." May's conduct fails to fit snugly within this exemption, or within the several other exemptions to the prohibited transactions relied upon by May.[8] The legislative history suggests that "services" was intended to include the provision of office space, legal and accounting support, and the like. H.R. Rep. 93–1280, 93d Cong. 2d Sess. 312 (1974), reprinted in [1974] U.S.Code Cong. and Ad. News 5038, 5092.

Nevertheless, the Department of Labor,[9] in an April 16, 1980 information letter, in-

---

8. May also cites a Department of Labor "class exemption" for interest-free loans to a plan, 45 Fed.Reg. 28545 (April 29, 1980) and the provision at section 408(c)(2) exempting from the prohibited transactions enumerated in section 406 any bar to a fiduciary's receipt of "reim-

bursement of expenses properly and actually incurred, in the performance of his duties with the Plan."

9. The Department of Labor is the agency charged with principal responsibility for en-

terpreted sections 406 and 408(b)(2) in a case in which a group life insurance plan had been reimbursing an employer for premiums paid by the employer. The Department concluded that "[t]he act of paying premiums on insurance policies through which plan benefits are provided is a service to the plan" and that, therefore, "payments by the plan which reimburse the service provider for the premium expense are exempt from section 406(a) if the service and reimbursements meet the conditions of section 408(b)(2) and the regulations thereunder." [10]

This Court, based in large part on the Department of Labor's interpretation, concludes that May's advances were in fact "services" and thus reimbursable. Any other conclusion would conflict with the overall Congressional intent in enacting ERISA. The fiduciary standards and obligations imposed by ERISA were intended to prevent abuse and misuse of pension funds. *See, e.g.,* S.Rep. 93–383, 93d Cong. 1st Sess. 3–4 (1973), reprinted in [1974] U.S.Code Cong. and Ad.News 4890, 4892. As one of the Act's key sponsors in the House, Rep. Carl Perkins, stated: "[S]ince trustees and managers of plans have not always been above manipulating or investing funds for their own gain rather than in the interest of the beneficiary, fiduciary standards are established which will provide additional safeguards against mismanagement." [11] Thus, courts have consistently found violation of

these fiduciary obligations only when the fiduciary acted in an abusive or self-profiting fashion precisely like that which ERISA was intended to prevent. [12]

May's conduct, however, was a far cry from the sort Congress sought to block. May not only has not profited from its conduct, but the refunds which it received fell $302,993 short of fully reimbursing it for its payments from 1967 through 1978. Moreover, affidavits of company officials [13] suggest that the company in good faith interpreted section 18 as permitting the activities challenged here; fiduciaries of plans "do not breach their fiduciary duty by interpreting the plan in good faith." *Challenger v. International Bridge, Structural & Ornamental Ironworkers*, 619 F.2d 645, 649 (7th Cir. 1980).

Most importantly, May's payments were made in the best interest of the plan participants and beneficiaries. This is a contributory plan, paid for by the employees, not by the employer; May has never had any obligation to contribute toward the payment of the insurance premium. Since the rates at which the employee contributions were set was a matter within May's sole discretion, the monies needed in the years in which the fund experienced a shortfall would—had May not voluntarily stepped forth with its own cash—have had to come directly out of employee paychecks. As a result, the employees would have been required to make annual contributions—involving as much as

---

forcing ERISA's fiduciary responsibility standards. *See* 29 U.S.C. §§ 1132–1138.

**10.** Corley, on the other hand, cites a September 8, 1980, Labor Department letter which, she contends, confirms precisely the opposite conclusion of that in the earlier letter. In the September letter, the Department, responding to a request by counsel for Corley, concluded that an employer's contribution to a plan is *not* a "service" for which compensation may be paid. However, the counsel's request referred to a situation in which the employer is *required* to contribute to the plan; in the instant case, however, May's contributions were strictly *voluntary*. The *voluntariness* of the contribution is, for obvious reasons, of critical significance in this analysis.

**11.** February 26, 1974, statement of Rep. Carl Perkins, Chairman House Committee on Education and Labor (reprinted in 3 Legislative History of ERISA, at 3370 (1976)).

**12.** *See, e.g., Marshall v. Kelly*, 465 F.Supp. 341 (W.D.Okla., 1978) (trustee of plan caused plan to renew low-interest loans to company which he owned despite declining financial condition of the company and a considerable risk of large losses; the trustee also caused plan to pay himself a sales commission and to pay his company additional construction costs despite lack of any obligation on the part of the plan to do so).

**13.** See footnote 5 above.

$262,103—in order to pay the retroactive premium required by Metropolitan. Thus, were this Court to adopt Corley's argument that May's voluntary payments, intended to satisfy a shortfall in the employees' aggregate contribution, were non-reimbursable under ERISA, the result would be incongruous. A statute, designed to "improv[e] the equitable character and soundness" of private pension plans, § 2, 29 U.S.C. § 1001, would have the effect of creating a less stable system of employee benefits. Federal courts have authority to create principles of employee benefit law in accordance with the policies propelling ERISA, *Gilliam v. Edwards*, 492 F.Supp. 1255, 1261 (D.N.J. 1980). This Court refuses to mandate a result counter to those policies.

■ However, while the obtaining of reimbursements did not, by itself, violate any of the prohibited transactions enumerated in § 406, the manner in which these reimbursements were obtained and May's overall handling of the assets ran afoul of the duty of care imposed by § 404. May's conduct, while perhaps well-intentioned, was highly unprofessional and careless. The company apparently relied upon an ambiguous provision in a contract and a strikingly broad interpretation of a statutory exemption, i.e., that a "service" includes monetary advances, in acting as it did. Although this Court has concluded that the company correctly interpreted both the insurance policy and the statute, a fiduciary is obligated under ERISA to carry out its functions with "care, skill, prudence and diligence." § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B). This standard incorporated the common law of trusts, *see Eaves, supra*, 587 F.2d at 457, which requires that a trustee strictly separate the trust property from his own property, and refrain from placing himself in a position where his personal interest may conflict with the interest of the beneficiary. *See Bird v. Stein*, 258 F.2d 168, 177 (5th Cir. 1958), *cert. den.*, 359 U.S. 926, 79 S.Ct. 608, 3 L.Ed.2d 628 (1959). Moreover, one of the most important duties of a trustee is loyalty to the beneficiaries, and in applying that rule, the court is less concerned with unjust enrichment than it is with the ethical and efficient administration of the trust. *See, e.g., In re Bond and Mortgage Guaranty Co.*, 303 N.Y. 423, 430–431, 103 N.E.2d 721 (1952).

■ May violated these fiduciary obligations. The company could have clearly established, in writing, that its advances were interest-free loans, subject to reimbursement in later years; instead, the company simply advanced the monies to the fund and recorded the payments and refunds in a balance sheet liability account on its books. Instead of attempting to ensure that there would exist no doubt about the propriety of its action—such as, for instance, arranging for a third-party to make loans to the plan—May placed itself in a position where its personal interest could at least have the appearance of conflicting with the interest of the beneficiary.

Thus, this Court concludes that while the reimbursements were not prohibited transactions under section 406 of the Act, May violated its duty of care, prudence and diligence under section 404 in failing to clearly differentiate between its own money and that belonging to the Plan. Informal transactions between the fiduciary and the Plan, for whatever purpose, are barred under section 404, particularly where, as here, May could have made clear, in writing, that it was expecting reimbursement for the advances.

2.

■ This Court further finds fault with May's conduct under the disclosure requirements of the Act. Under section 101(a), 29 U.S.C. § 1021(a), duties of disclosure are imposed upon the administrator of an employee benefit plan. Those duties include the distribution to participants and beneficiaries of a summary plan description that is sufficiently accurate and comprehensive to reasonably apprise the participants and beneficiaries of their rights under the plan.

ERISA § 102(a)(1), 29 U.S.C. § 1022(a)(1). The summary description must be "written in a manner calculated to be understood by the average plan participant or beneficiary." H.R.Rep. 93–1280, 93d Cong.2d Sess. 258 (1974). Furthermore, the description must not have the effect of misleading, misinforming or failing to inform participants. 29 C.F.R. 2520.102–2(b).

Here, the May Company violated its duty under the statute and regulations by failing to inform the participants that it expected reimbursement for its voluntary payments. In fact, the summary description, an eight-page brochure entitled "Your Group Life Insurance Plan," led the May employees to believe the contrary; the brochure includes a statement that "[t]he low cost of this plan is made possible by the company *paying* the difference between your contribution and the total cost of the plan" (emphasis added). A common sense reading of that statement is that the company did *not* expect reimbursement for its "payments" to the plan. Such a misleading statement is violative of section 102(a)(1) of the Act.[14]

### C. Remedies

 This Court has broad scope under ERISA to provide relief for fiduciary breaches. ERISA § 409, 29 U.S.C. § 1109. While the reimbursements did not, by themselves, violate the Act, May's conduct in obtaining such reimbursements fails to satisfy the duty of care and diligence required of all fiduciaries under the Act. In addition, the misleading statement in the summary plan description constituted a violation of the disclosure provisions of the Act.

While this Court will not require May to return the dividends to the Plan, further reimbursement will not be permitted. Thus, the $302,993 which is still owed May will not be recoverable.[15] In addition, this Court will enjoin May from serving as fiduciary with respect to the Plan. May is required to nominate a successor fiduciary as administrator of the Plan and submit the proposed nominee to the Court for approval. The successor fiduciary is ordered to hold in trust the refunds which are now held by Metropolitan in the rate stabilization reserve; those assets may be applied in a fashion which the trustee determines is most beneficial to the Plan.

In addition, May is required to prepare and issue to all employees a new summary plan description which correctly indicates that premiums are paid *solely* by the employees themselves and not through any contributions by May. Finally, May is required to prepare and circulate to all participants a notice explaining that (1) May has been removed as fiduciary pursuant to a court order, (2) the rate stabilization reserve will be applied solely toward payment of premiums, and (3) May will no longer be allowed to obtain reimbursement for its voluntary contributions to the Plan during the years 1967–78.

---

14. This Court further finds that the plaintiff's other disclosure claims, relating to May's alleged failure to make available for inspection various Plan documents, are lacking in merit.

15. It should be noted that under the 1977 arrangement between May and Metropolitan establishing the rate stabilization reserve, the $302,993 is also not recoverable since refunds are now added to the reserve and not used to reimburse May. Moreover, May apparently has no great desire for reimbursement of that money since the company, in a recent letter to the Court, informed the Court that sufficient monies had been added to the reserve to enable the company to declare a "premium holiday."