Robert S. HILLIS, Plaintiff,

v.

WAUKESHA TITLE CO., INC., a Wisconsin Corporation, Waukesha Title Co., Inc. Profit Sharing Plan, John J. Gehringer, Defendants.

Civ. A. No. 78–C–662.

United States District Court,
E.D. Wisconsin.

Dec. 12, 1983.

Michael F. Dubis, Waterford, Wis., for plaintiff.

James W. Hammes, Cramer, Multhauf & Curran, Waukesha, Wis., for defendants.

## DECISION AND ORDER

REYNOLDS, Chief Judge.

This is an action to recover vested pension benefits that were allegedly unlawfully forfeited. In an order dated March 12, 1981, the Court entered judgment for the plaintiff, but this judgment was reversed on appeal, and the case was remanded on August 20, 1982, 688 F.2d 844. The issues remaining for decision are (1) whether defendants' noncompetition clause violates Wis.Stat. § 103.465, and (2) whether defendants' undisputed failure to inform plaintiff of the noncompetition clause releases plaintiff from its operation. I find that the noncompetition clause is valid under Wisconsin law. However, I conclude that the record supports a judgment for plaintiff on the second issue.

### I.

In a trial to the Court on October 1, 1980, it was established that the plaintiff was employed by the defendant Waukesha Title Co., Inc. ("the Company") from January 2, 1973 until December 23, 1977. The Company is in the business of providing title insurance, a service industry, and plaintiff's position was that of title examiner and attorney. His duties included searching court files, examining titles, making title commitments, and dealing with escrowed funds. About 90% of plaintiff's work day was spent either at the Company's offices or in courthouses. Plaintiff had daily contact with the Company's clients. However, he was not engaged in finding new clients or promoting new business opportunities for the Company. These duties were given to the Company's full-time public relations employee, a Mr. Jack Risch.

The title insurance industry includes smaller insurers, such as the Company, who do business in a single or a few counties, and larger insurers who do business in counties nationwide. The business is cen-

tered around the Register of Deeds in each county. Therefore, competition in the industry primarily occurs within county boundaries.

During the term of plaintiff's employment, the Company maintained the Waukesha Title Co., Inc. Profit Sharing Plan ("the Plan") to which contributions were made on plaintiff's behalf. The Plan was amended, effective January 1, 1976, to comply with the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* (ERISA). Contributions to the Plan were made on plaintiff's behalf for the years 1976 and 1977.

Plaintiff was aware of the existence of the Plan throughout his employment with the Company. However, the Plan administrator, defendant John J. Gehringer, never gave plaintiff a summary Plan description or a copy of the Plan. Plaintiff never requested to see the Plan before December 23, 1977. Employees of the Company were generally unaware of the Plan's specific provisions.

Among the specific Plan provisions was Section 4.04 which covered benefit forfeitures. The section provides in pertinent part:

> Any Participant who leaves the Company's service with less than ten years of Vesting Schedule Service and who, within two years of such termination, directly or indirectly aids a competitor of the Company as an employee, shareholder, partner, proprietor, officer or director, shall forfeit his entire vested interest.

On December 19, 1977, plaintiff advised defendant Gehringer that he intended to leave the Company at the end of the 1977 calendar year. He explained that the workload was too great and that he was consequently upset and nervous. Plaintiff and Gehringer met again two days later, at which time plaintiff iterated his intention to leave and his belief that his workload was disproportionately large. When Gehringer inquired into plaintiff's future plans, plain-

tiff responded that he was considering working for his father, who was an attorney, or for Commonwealth Land Title Insurance Company ("Commonwealth"), an insurer doing business nationwide and a competitor of the Company from whom plaintiff had received an offer.

On December 23, 1977, Gehringer called plaintiff into his office to tell him that he was fired. Gehringer said he had heard from an unidentified source that plaintiff had accepted employment with Commonwealth, and told plaintiff that plaintiff would regret his decision. In fact, plaintiff did not accept employment with Commonwealth until December 27, 1977. By firing Hillis on December 23, 1977, Gehringer sought to prevent Hillis from securing a Company contribution on his behalf for the year 1977.

Plaintiff's duties as an employee of Commonwealth were the same as those he performed for the Company. Additionally, through his client contacts plaintiff had occasion to persuade the Company's customers to transfer their business to Commonwealth.

Several months after the termination, plaintiff wrote to Gehringer, requesting payment of his vested interest in the Plan. Gehringer advised plaintiff that because he violated the restrictive covenant contained in Section 4.04 of the Plan, his benefits had been forfeited. This was the first time plaintiff became aware of Section 4.04.

## II.

Plaintiff's primary contention on remand is that Section 4.04 of the Plan is invalid under Wis.Stat. § 103.465.[1] That statute provides:

> A covenant by an assistant, servant or agent not to compete with his employer or principal during the term of the employment or agency, or thereafter, within a specified territory and during a specified time is lawful and enforceable only

---

1. In view of the procedural posture of this case, it is in the interest of judicial economy to address both of plaintiff's contentions, even

though one of them is of sufficient merit to support a judgment in his favor.

if the restrictions imposed are reasonably necessary for the protection of the employer or principal. Any such restrictive covenant imposing an unreasonable restraint is illegal, void and unenforceable even as to so much of the covenant or performance as would be a reasonable restraint.

By providing for a forfeiture of vested benefits upon the participant's aiding any competitor, plaintiff contends that Section 4.04 contains no reasonable restrictions and is therefore unenforceable as an illegal restraint of trade.

 The Wisconsin legislature has not established a *per se* rule that covenants restricting competition after a term of employment are illegal contracts in restraint of trade. Rather, a restrictive covenant is enforceable if it is found to be reasonable in the particular circumstances of its operation. *Rollins Burdick Hunter of Wisconsin, Inc. v. Hamilton,* 101 Wis.2d 460, 304 N.W.2d 752 (1981). In this context, Wisconsin courts consider five issues: (1) whether the covenant is necessary to protect the employer; (2) whether it provides a reasonable time period; (3) whether it covers a reasonable territory; (4) whether it is reasonable as applied to the employee; and (5) whether it is reasonable with reference to the public's interest in unrestrained competition. *Chuck Wagon Catering v. Raduege,* 88 Wis.2d 740, 277 N.W.2d 787 (1979). The statute and interpretive case law apply to profit-sharing and pension plans, such as the one at bar. *Holsen v. Marshall & Ilsley Bank,* 52 Wis.2d 281, 190 N.W.2d 189 (1971).

Plaintiff raises only two substantial challenges to Section 4.04. First, he argues that it specifies no territory and is therefore unreasonable as a matter of law. Second, he contends that it is utterly unnecessary to protect the Company. Neither contention has merit.

 A restrictive covenant is not *per se* invalid merely because it lacks an express geographic limitation. *Rollins Burdick Hunter of Wisconsin, Inc.,* 101 Wis.2d at 466–467, 304 N.W.2d at 755.

Nor is there any flat rule invalidating all restrictive covenants whose scope exceeds the former employee's actual customer contact. *Id.* at 468, 304 N.W.2d at 756. Rather, in the absence of a geographic limitation, the reviewing court should assess the particular circumstances surrounding the covenant. In this case, no one disputes that competition in the title insurance industry occurs at the county level. Thus, for purposes of Section 4.04, a "competitor" would necessarily be a title insurance company doing business in the same county as the Company. In other words, the uniquely local nature of competition placed an effective check on Section 4.04's operation. I conclude that Section 4.04 is valid with respect to its territorial application.

 Further, Section 4.04 was reasonably necessary to protect the Company. In this context, the evidence establishes that while plaintiff was not officially responsible for creating business opportunities for the Company, he was in contact with its clients on a daily basis while in its employ. After he left the Company, he sought at least once to transfer a Company client's business to Commonwealth. In general, the record supports the conclusion that during his employment with the Company, plaintiff's client contacts were sufficient to develop substantial good will. The Company was therefore justified in taking measures to prevent former employees from diverting its business to competitors. Finding Section 4.04 reasonable in this and all other respects, I conclude that Wis.Stat. § 103.465 is no bar to enforcement of the forfeiture provision against plaintiff.

### III.

Plaintiff next contends that his ignorance of Section 4.04 should release him from its operation. Specifically, plaintiff contends that the profit sharing plan was a component of his employment contract, and that as a contractual provision, it must have been the product of a "meeting of the minds" to be enforceable. Because plaintiff was never informed of the restrictive

covenant, there could have been no "meeting of the minds," and, therefore, the covenant is not enforceable against him.

I assess the merits of plaintiff's contentions against the backdrop of ERISA's express provisions and its legislative history. Of particular significance to the present action are the following provisions of ERISA that impose reporting requirements on benefit plan administrators with respect to plan participants. 29 U.S.C. § 1021 provides in relevant part:

> (a) Summary plan description and information to be furnished to participants and beneficiaries. The administrator of each employee benefit plan shall cause to be furnished in accordance with section 104(b) [29 U.S.C. § 1024(b) ] to each participant covered under the plan and to each beneficiary who is receiving benefits under the plan—
>
> (1) a summary plan description described in section 102(a)(1) [29 U.S.C. § 1022(a)(1); . . . .

29 U.S.C. § 1022, in turn, provides:

> (a)(1) A summary plan description of any employee benefit plan shall be furnished to participants and beneficiaries as provided in section 104(b) [29 U.S.C. § 1024(b) ]. The summary plan description shall include the information described in subsection (b), shall be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan. A summary of any material modification in the terms of the plan and any change in the information required under subsection (b) shall be written in a manner calculated to be understood by the average plan participant and shall be furnished in accordance with section 104(b)(1) [29 U.S.C. § 1024(b)(1) ].
>
> . . . .
>
> (b) The plan description and summary plan description shall contain the following information: . . . circumstances which may result in disqualification, ineligibility, or denial or loss of benefits; . . . .

Finally, 29 U.S.C. § 1024(b) provides in part:

> Publication of summary plan description and annual report to participants and beneficiaries of plan. Publication of the summary plan descriptions and annual reports shall be made to participants and beneficiaries of the particular plan as follows: (1) The Administrator shall furnish to each participant, and each beneficiary receiving benefits under the plan, a copy of the summary, plan description, and all modifications and changes referred to in section 102(a)(1) [29 USC § 1022(a)(1) ]—
>
> (A) within 90 days after he becomes a participant, or (in the case of a beneficiary) within 90 days after he first receives benefits, or
>
> (B) if later, within 120 days after the plan becomes subject to this part.
>
> . . . .

Review of the pertinent legislative history discloses Congress' intent to prevent, through the above-quoted provisions, the inequities that stem from a plan administrator's failure to apprise participants of the essential provisions of their benefit plans:

> An important issue relates to the effectiveness of communication of plan contents to employees. Descriptions of plans furnished to employees should be presented in a manner that an average and reasonable worker participant can understand intelligently. It is grossly unfair to hold an employee accountable for acts which disqualify him from benefits, if he had no knowledge of these acts, or if these conditions were stated in a misleading or incomprehensible manner in plan booklets. Sub-committee findings were abundant in establishing that an average plan participant, even where he has been furnished an explanation of his plan provisions, often cannot comprehend them because of the technicalities and complexities of the language used.

H.R.Rep. No. 93–533, 93d Cong., 1st Sess., *reprinted in* [1974] U.S.Code Cong. & Adm.News 4639, 4646. Legislation in existence prior to the enactment of ERISA had fallen short of protecting plan participants' interests in this respect:

> Experience has ... demonstrated a need for a more particularized form of reporting so that the individual participant knows exactly where he stands with respect to the plan—what benefits he may be entitled to, what circumstances may preclude him from obtaining benefits, what procedures he must follow to obtain benefits, and who are the persons to whom the management and investment of his plan funds have been entrusted.

*Id.* at 4649. In summary, the statutory disclosure provisions and the legislative history illustrate Congress' solicitude for plan participants who frequently are not versed in the vernacular of contract law or the law of trusts, and are not always in a position to bargain for disclosure provisions in their plans. With this concern in mind, I proceed to the merits of plaintiff's claim.

The testimony at trial clearly established that plaintiff had no idea that he would forfeit his rights to benefits under the Plan by working for a competitor, and that the defendants utterly failed to provide this essential information. The plaintiff's claim for relief sounds in contract, yet plaintiff emphasized at trial the defendants' failure to discharge their statutory duty of disclosure. The issue, then, is whether the defendants' failure to observe the summary disclosure provisions gives rise to an equitable right of action in the plaintiff where the plaintiff was injured as a consequence of the failure. I answer this question in the affirmative.

ERISA's civil enforcement provision, 29 U.S.C. § 1132, provides in part:

> (1) Persons empowered to bring a civil action. A civil action may be brought—
> ....
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this title

or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan;
> ....

The legislative history indicates Congress' intent to supply a full panoply of remedies for violations of ERISA:

> The enforcement provisions have been designed specifically to provide both the Secretary and participants and beneficiaries with broad remedies for redressing or preventing violations of the Act. The intent of the Committee is to provide the full range of legal and equitable remedies available in both state and federal courts and to remove jurisdictional and procedural obstacles which in the past appear to have hampered effective enforcement of fiduciary responsibilities under state law for recovery of benefits due to participants.

H.R.Rep. No. 93–533, 93d Cong., 1st Sess., *reprinted in* [1974] U.S.Code Cong. & Ad. News 4639, 4655. Accordingly, courts have recognized their broad powers to fashion equitable remedies for victims of pension plan mismanagement, including restitution and other relief necessary to make the victim whole. *See, e.g., Bittner v. Sadoff & Rudoy Industries,* 490 F.Supp. 534 (E.D.Wis.1980); *Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629 (W.D.Wis. 1979).

■ There is no statutory provision or case law that addresses the specific problem presented on these facts. However, in *Corley v. Hecht Co.,* 530 F.Supp. 1155 (D.D.C.1982), the court found that a misleading statement in a summary plan description provided grounds for equitable relief. The description in *Corley* contained the statement that " '[t]he low cost of this plan is made possible by the company *paying* the difference between your contribution and the total cost of the plan' (emphasis added)." 530 F.Supp. at 1164. In the court's view, this statement gave readers the reasonable impression that the company did not expect to be reimbursed for its

voluntary contributions. The company's intentions, however, were to the contrary. Accordingly, as an alternative holding, the court held that the misleading statement violated ERISA's summary disclosure provisions and ordered that the plan administrator remove itself and appoint a successor, and distribute an accurate summary plan description to the plaintiff and her fellow employees. While the problem and the solution in *Corley* differ from the problem and the requested relief in the present case, *Corley* exemplifies the courts' power to redress violations of the summary disclosure provisions.

Of course, statutory provisions of redress for violations of specific sections of ERISA might imply that Congress did not intend to provide redress for violations of other sections. *Expressium facit cessare tacitum.* In this regard, 29 U.S.C. § 1132(c) provides:

> ... Any administrator who fails or refuses to comply with a request for any information which such administrator is required by this title to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

From this, I might infer that Congress intended to afford relief for violations of the reporting and disclosure provisions only where the claiming participant or beneficiary initially has requested information from the plan administrator.

I decline to draw this inference. The foregoing maxim of construction is to be cautiously applied and should be set aside if an expanded interpretation of the statute serves the purpose for which the statute was enacted. 2A Sutherland, Statutory Construction § 47.25 (4th ed. 1972). Reference to ERISA's legislative history and Congress' intent to provide "the full range of legal and equitable remedies," H.R.Rep. No. 93–533, 93d Cong., 1st Sess., *reprinted in* [1974] U.S.Code Cong. & Ad.News 4639, 4655, buttresses the conclusion that § 1132(a)(3)(B) contemplates equitable relief in cases such as the one at bar.

In summary, the Court derives its authority from a statute that was enacted for the benefit of pension plan participants, such as the plaintiff. The legislative history indicates that persons such as the plaintiff were to enjoy a full range of legal and equitable powers to redress violations of the statute. Finally, by virtue of 29 U.S.C. § 1144(a) which provides—

> ... Except as provided in subsection (b) of this section, the provisions of this title and title IV shall supersede any and all State laws insofar as they may now or hereafter relate to any employee benefit plan described in section 4(a) [29 USCS § 1003(a)] and not exempt under section 4(b) [29 USCS § 1003(b)]. This section shall take effect on January 1, 1975.

whatever right of action the plaintiff might have had under state law has been preempted. Given Congress' intention that plan participants know exactly where they stand with regard to their rights to benefits, and the courts' broad power to insure that this intention is given effect, I hold that where a plan participant is reasonably unaware of a benefit forfeiture clause, and where the plan administrator fails to take any steps to advise the participant of the forfeiture clause, the forfeiture clause may not be enforced against the participant. Plan participants who are injured by the administrators' omission may seek appropriate relief under 29 U.S.C. § 1132(a)(3)(B).[2]

---

**2.** A mere procedural violation may not give rise to a substantive remedy. *Wolfe v. J.C. Penney Co.,* 710 F.2d 388 (7th Cir.1983). Therefore, a showing of injury may be essential to the plaintiff's right to equitable relief, for there may be some violations of ERISA's reporting and disclosure provisions that do not result in cognizable injury. *See, e.g., Hernandez v. Southern Nevada*

In the present case, the plaintiff testified that the pension benefits were important to him, and that he would not have given notice if he had known that he risked forfeiture of his benefits. Thus, defendant Gehringer's failure to inform plaintiff of the forfeiture provision and its restrictive covenant resulted in plaintiff's forfeiture of his vested benefits. I find it appropriate, therefore, to order the current Plan administrator immediately to pay plaintiff his vested benefits. For the reasons set forth in my order of March 12, 1981, this amount shall include plaintiff's share of a contribution for the year 1977. It shall also include amounts earned on this sum. Additionally, plaintiff is entitled to reasonable attorney's fees and costs under 29 U.S.C. § 1132(g). In this case, an award of $2,600 is appropriate.

### ORDER

IT IS THEREFORE ORDERED that judgment be entered for the plaintiff in the amount of $6,804.94, which represents the cumulative amount of vested benefits accrued to the plaintiff through the year ending December 31, 1977, and the earnings thereon, with interest at the rate provided by law.

IT IS FURTHER ORDERED that the defendants immediately pay to the plaintiff his cumulative amount of vested pension benefits and the earnings thereon, with interest at the rate provided by law.

IT IS FURTHER ORDERED that the plaintiff shall be awarded attorney's fees and costs in the amount of $1,500, with interest at the rate provided by law.

*Culinary & Bartenders Pension Trust,* 662 F.2d 617 (9th Cir.1981).