957 F.2d 449
 DEUTCHLAND ENTERPRISES, LTD., Sun Land Enterprises, Ltd.,
G-S Beaver Dam Enterprises, Ltd., G-S Enterprises, Ltd., G-S
Sheboygan Enterprises, Ltd., Kenneth R. Schiefelbein, and
Jon R. Guiles, Plaintiffs-Appellants,
v.
BURGER KING CORPORATION, Defendant-Appellee.
 No. 90-2090.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 14, 1991.
Decided March 6, 1992.
 
 Howard A. Pollack (argued), Mark M. Leitner, Adrian N. Cohen, Charne, Clancy & Taitelman, Milwaukee, Wis., for plaintiffs-appellants.
 Andrew O. Riteris, Joshua L. Gimbel, Michael, Best & Friedrich, Milwaukee, Wis., Brian Sullivan (argued), Breed, Abbott & Morgan, New York City, for defendant-appellee.
 Before CUMMINGS, POSNER and KANNE, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 Kenneth R. Schiefelbein and Jon R. Guiles and other plaintiffs-appellants,[1] are franchisees of defendant-appellee Burger King Corporation ("Burger King"). They operate Burger King restaurants in several locations in Wisconsin, including Sun Prairie, Beaver Dam, and Sheboygan. Burger King terminated those franchises after discovering that Schiefelbein also owned several Hardee's franchises. At issue is whether the district court, finding that Burger King had the right to terminate the franchise agreements with Schiefelbein and Guiles, properly granted summary judgment to Burger King.
 
 
 2
 In 1981, Jon Guiles and Barbara Schiefelbein, Kenneth Schiefelbein's wife, became partners in a Burger King franchise in Fond du Lac, Wisconsin. Barbara was the operating partner, responsible for the day-to-day management of the restaurant. Burger King also approved Jon Guiles and Barbara Schiefelbein to be multi-store owners, which allowed them to operate several franchises.
 
 
 3
 Between January 1984 and June 1986, Kenneth Schiefelbein and Jon Guiles entered into five franchise agreements with Burger King. Each agreement granted them a 20-year license to operate a Burger King restaurant. The restaurants were each owned and operated through separate closely held corporations, the corporate plaintiffs in this case. For these restaurants, Kenneth Schiefelbein was the operating partner. Burger King informed Schiefelbein and Guiles that they had been approved for expansion, but after 1986 it did not approve any of their proposals to open additional restaurants.
 
 
 4
 The franchise agreements between Burger King and Schiefelbein and Guiles contained covenants prohibiting the franchisees from competing with Burger King. Four of the franchise agreements contained this provision:
 
 
 5
 FRANCHISEE agrees that during the term of this Agreement he will not have any interest in any restaurant business which is the same or similar to Burger King Restaurants.
 
 
 6
 The fifth agreement contained this provision:
 
 
 7
 FRANCHISEE agrees that during the term of this agreement it shall not engage in any restaurant or prepared food business which is the same or similar to Company's business.
 
 
 8
 In 1986, Schiefelbein became impatient with Burger King's reluctance to permit him to expand. In the summer of that year, Schiefelbein met with officials of Hardee's Restaurant Systems, Inc. ("Hardee's") and began to discuss the possibility of opening a Hardee's franchise. Schiefelbein and one of his employees, David Koszewski, applied to be Hardee's franchisees and began negotiations to enter into a long-term contract.
 
 
 9
 Schiefelbein then attempted to sell his share of the Burger King franchises to Guiles. On October 13, 1986, Guiles wrote to Burger King that he had purchased Schiefelbein's shares in the Burger King franchise corporations. Burger King, on June 24, 1987, notified Schiefelbein and Guiles that the franchises would be terminated because Guiles had not qualified as an operating partner. Guiles at first sought to become an operating partner, but later decided that he could not afford to sacrifice the three months necessary to complete Burger King's training program. Thereafter, Guiles and Schiefelbein apparently rescinded the sale agreement. On August 15, 1987, Schiefelbein notified Burger King that he would retain his ownership interests in the franchises.
 
 
 10
 To avoid violating the "same or similar" clause, Schiefelbein next sought to sell his Burger King franchises to his wife Barbara, who was already a Burger King franchisee and an operating partner. Burger King did not approve the sale, because, it stated, it was not convinced that Barbara could manage more than one store.
 
 
 11
 Meanwhile, during 1986 and 1987, Schiefelbein and Koszewski had entered into five franchise agreements with Hardee's. Schiefelbein assigned his Hardee's franchises to a corporation he formed, Wolverine Fast Foods, Inc., ("Wolverine"). On September 8, 1987, Burger King, claiming that Schiefelbein was in violation of the "same or similar" clauses in the franchise agreements, sent a notice of default to Schiefelbein.
 
 
 12
 After receiving Burger King's notice of default, Schiefelbein engaged in a complicated set of transactions which transferred the Hardee's franchises to several corporations. As we noted above, Schiefelbein initially assigned the Hardee's franchises to Wolverine. In that assignment, Schiefelbein agreed with Hardee's that he "shall at all times remain primarily liable to Hardee's for the performance and keeping of all obligations and covenants required to be kept or performed by the Licensee under the License Agreement." No document negates Schiefelbein's continuing obligation to Hardee's. Schiefelbein also entered into a five year development agreement with Hardee's, which gave him the exclusive right to develop Hardee's restaurants in western Michigan. Schiefelbein assigned this agreement to a business associate, Michael Embs, on October 20, 1988.
 
 
 13
 Next, Wolverine transferred the Hardee's franchise agreements to Embs and Koszewski. Finally, the franchise agreements were again transferred to Wolverine.
 
 
 14
 At first, Schiefelbein was the sole owner of Wolverine, but on October 15, 1987, he transferred his interest in Wolverine to Embs. At the time summary judgment was entered, the "sale" of Wolverine to Embs had not required Embs to make any payments to Schiefelbein. Wolverine's office, in Pearl Plaza, Oshkosh, Wisconsin, was located on the same premises as the offices of Schiefelbein's Burger King franchises. Wolverine had no employees of its own. MarJo Corporation, of which Schiefelbein was President, provided financial services to Wolverine. In addition, MarJo employed all of the personnel who worked at the Pearl Plaza offices and supplied management personnel to the Hardee's franchisees. Schiefelbein and Guiles also owned PM & K Partnership, which owned the Pearl Plaza office building.
 
 
 15
 Wolverine had never operated at a profit, because it payed rent to J.K. Partnership ("J.K."), which was owned by Schiefelbein and Guiles. J.K. also owned all of the real estate, buildings, and equipment of the Hardee's and Burger King franchises. At his deposition, Guiles testified that Schiefelbein made all decisions for J.K. concerning new investments in Hardee's restaurants, including whether to invest in new restaurants and equipment, and where to build.
 
 
 16
 Wolverine was not even responsible for the construction of the Hardee's franchises. Mid-States Real Estate Corporation ("Mid-States"), which was owned by Schiefelbein and Embs, located the sites in Michigan for the Hardee's restaurants and earned income by constructing the Hardee's buildings.
 
 
 17
 On December 1, 1987, Schiefelbein wrote to Burger King that: "[a]ll interest which I ever had in Hardee's restaurants has been sold." Burger King requested Schiefelbein to sign a proposed affidavit to that effect. Schiefelbein refused. After extending the deadline to sign the affidavit, on August 24, 1988, Burger King notified Schiefelbein and Guiles that the franchises would be terminated effective September 24, 1988.
 
 
 18
 On September 1, 1988, Schiefelbein, Guiles and the other corporate plaintiffs filed suit seeking an injunction prohibiting Burger King from terminating the franchise agreements. Burger King answered and counterclaimed seeking a declaratory judgment that the termination of the franchises was valid, and other relief.
 
 
 19
 After discovery was completed, Burger King moved for summary judgment, seeking dismissal of Schiefelbein's amended complaint, and summary judgment on its counterclaims as to liability only. The district court granted Burger King's motion on April 23, 1990, ruling that Schiefelbein had violated the "same or similar" clause. It further ruled that the clause was reasonable under the Wisconsin Fair Dealership Law ("WFDL"), WIS.STAT. § 135.01 et seq., that Schiefelbein had not cured the violation of the clause and, finally, that Burger King had good cause to terminate the agreements. On May 17, 1990, the district court dissolved the stipulated preliminary injunction which barred Burger King from terminating the franchises. This appeal followed.
 
 
 20
 We review a grant of summary judgment de novo. See e.g., La Preferida, Inc. v. Cerveceria Modelo, S.A., 914 F.2d 900, 905 (7th Cir.1990). In reviewing a grant of summary judgment, we "view the record and all inferences drawn from it in the light most favorable to the party opposing the motion." Lohorn v. Michal, 913 F.2d 327, 331 (7th Cir.1990). We must be satisfied that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); First Wisconsin Trust Co. v. Schroud, 916 F.2d 394, 398 (7th Cir.1990).
 
 
 21
 We must first determine whether Schiefelbein violated the "same or similar" clause contained in the franchise agreements with Burger King. Schiefelbein does not attempt to argue that he was in compliance with the "same or similar" clause when he received Burger King's notice of default, on September 8, 1987. At that time, Schiefelbein was the owner of several Hardee's franchises, in plain violation of the "same or similar" clause in the franchise agreement with Burger King.
 
 
 22
 Schiefelbein principally argues that the "same or similar" clause is illegal under the WFDL. That statute prohibits franchisors from terminating franchisees without "good cause." WIS.STAT. § 135.03. It defines "good cause" as:
 
 
 23
 [f]ailure by a dealer to comply substantially with essential and reasonable requirements imposed upon him by the grantor ... which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement.
 
 
 24
 WIS.STAT. § 135.02(4)(a). The franchisor or grantor must prove good cause. WIS.STAT. § 135.03. Schiefelbein argues that Burger King must prove that the "same or similar" clause was both "essential" and "reasonable," for the provision to survive challenge. We cannot agree. The terms "essential" and "reasonable" are closely related and were clearly intended to be read together. See M. Bowen & B. Butler, Wisconsin Fair Dealership, § 5.5, at 5-8 (1988) (noting that the individual elements of good cause are closely interrelated). Courts have considered the statutory terms "essential" and "reasonable" together, not separately. See C.L. Thompson Co. v. Festo Corp., 708 F.Supp. 221, 227-28 (E.D.Wis.1989) (analyzing good cause as a whole); L-O Distributors v. Speed Queen Co., 611 F.Supp. 1569, 1580 (D.Minn.1985).
 
 
 25
 Wisconsin courts have not decided whether a clause in a franchise contract which bars the franchisee from acquiring competing franchises during the term of the agreement is "essential and reasonable." Schiefelbein argues that a restriction in a franchise contract, like a restrictive covenant in an employment contract, must be limited to a specific territory or it is unreasonable. In applying § 103.465, Wisconsin courts ask whether a restrictive covenant "cover[s] a reasonable territory." Chuck Wagon Catering, Inc. v. Raduege, 88 Wis.2d 740, 277 N.W.2d 787, 792 (1979); WIS.STAT. § 103.465. Schiefelbein argues that the "same or similar" clause, which covers the entire United States, would be found unreasonable by Wisconsin courts.
 
 
 26
 Section 103.465 governs restrictions which apply to employees during their employment and after their employment has terminated. See Hillis v. Waukesha Title Co., Inc., 576 F.Supp. 1103 (E.D.Wis.1983) (upholding a restrictive covenant in the defendant's profit-sharing plan); Raduege, 277 N.W.2d at 793 (applying § 103.465 to uphold the application of a restrictive covenant after the employee had obtained another job). The franchise agreement between Burger King and Schiefelbein, however, prohibits Schiefelbein from owning a competitor only during the term of the agreement. The "same or similar" clause is thus unlike many restrictive covenants applying to terminated employees. Wisconsin courts would seemingly allow greater restrictions during the term of a contract than after the contract has terminated.[2]
 
 
 27
 We agree with the district court that it is "essential and reasonable" under the WFDL for a fast food chain to prohibit franchisees from operating its restaurants and those of its competitors. Franchisees have advance notice of the franchisor's marketing strategies, and access to its operating methods and policies. Schiefelbein's argument that entire fast food industry receives advance notice of Burger King's marketing strategies is unsupported by the record.
 
 
 28
 The "same or similar" clause also serves to reinforce the policies underlying the franchise contract. Schiefelbein agreed to devote his "full time and best efforts" to the operation of the Burger King franchises. Schiefelbein, however, transferred his key personnel from the Burger King franchises to his Hardee's franchises. Koszewski, one of the transferred managers, provided Hardee's with results of Burger King studies, operating procedures, and architectural drawings. The "same or similar" clause is essential and reasonable because it enabled Burger King to protect its information, marketing strategies, and operating policies from appropriation by Schiefelbein and Hardee's.
 
 
 29
 Schiefelbein argues that the "same or similar" clause is unenforceable because it has not enforced similar clauses in contracts with other franchisees. See WIS.STAT. § 135.04. Specifically, Schiefelbein claims that Burger King failed to enforce the agreement against Horn & Hardart and Marriot Corporation ("Marriot"). In the late 1970's Burger King engaged in litigation with Horn & Hardart to enforce the "same or similar" provision. Under the terms of a settlement agreement, Horn & Hardart disposed of a number of restaurants, but retained others. Marriot Corporation purchased Howard-Johnson's, which held several Burger King franchises. Marriot also owned the Roy Rogers chain of restaurants, which are similar to those of Burger King. Four years later Marriot sold the Roy Rogers chain.
 
 
 30
 Schiefelbein cannot show that he was a victim of discriminatory treatment because he is not "similarly situated" to Horn & Hardart and Marriot because both are large public corporations listed on the New York stock exchange. Burger King cannot expect that a public corporation will devote its "full time" to the operation of its Burger King franchises. Moreover, Burger King's litigation with Horn & Hardart occurred in the late 1970's, long before Schiefelbein became a franchisee.
 
 
 31
 Moreover, Schiefelbein cannot show that he was treated unfairly in comparison with Marriot and Horn & Hardart. Marriot sold its competing restaurant chain, and Horn & Hardart sold certain Burger King franchises but retained others. Because no other facts relating to the Horn & Hardart litigation are contained in the record, we cannot agree that Schiefelbein was treated unfairly in comparison with Horn & Hardart. Thus, we cannot agree with Schiefelbein that he was the victim of discriminatory treatment.
 
 
 32
 Schiefelbein argues that he properly cured his violation of the "same or similar" clause by selling his interests in the Hardee's franchise agreements to Embs on October 15, 1987. The district court referred to Schiefelbein's transfers of his Hardee's franchises as a "shell game." The evidence in the record overwhelmingly supports that conclusion. Although Schiefelbein sold his interest in the licensee, Wolverine, to Embs, he retained ownership interests in several corporations, including J.K., MarJo, and Mid-States, that reaped the profits from the Hardee's franchises. J.K. owned the real estate of the Burger King and Hardee's franchises, while MarJo corporation, provided management services to the Hardee's franchises. Mid-States earned additional income for Schiefelbein and Guiles by constructing the Hardee's buildings for Wolverine. The district court correctly concluded that Schiefelbein failed to cure his violation of the franchise agreement with Burger King.
 
 
 33
 We AFFIRM the judgment of the district court.
 
 
 
 [1]
 The other plaintiffs are corporations, owned by Schiefelbein and Guiles, which own the individual Burger King franchises
 
 
 [2]
 Burger King argues that Wisconsin courts would instead compare the "same or similar" clause to a restrictive covenant incident to the sale of a business. Under the standard Wisconsin courts apply to such covenants, Burger King would almost certainly prevail. See Reiman Assocs. v. R/A Advertising, Inc., 102 Wis.2d 305, 306 N.W.2d 292, 295 (Ct.App.1981) ("Covenants not to compete incidental to the sale of a business are not subject to exacting scrutiny...."). We do not decide this issue because we lack a firm basis to conclude that Wisconsin courts would view a restrictive covenant in a franchise contract to be similar to a covenant incident to the sale of a business