**Jesse E. WHITFIELD, et al.**

v.

**TORCH OPERATING COMPANY, et al.**

**Civil Action Nos. 94–0692, 94–2430.**

United States District Court,
E.D. Louisiana.

March 29, 1996.

---

Louis Leo Robein, Jr., Maria Claire Cangemi, Robein, Urann & Lurye, Metairie, LA, for plaintiffs.

Louis Leo Robein, Jr., Robein, Urann & Lurye, Metairie, LA for Alan Lane Babcock.

James Louis Weiss, Gordon, Arata, McCollam & Duplantis, New Orleans, LA, John P. Campbell, Verner, Liipfert, Bernhard, McPherson & Hand, Houston, TX, Loulan Joseph Pitre, Jr., Cut Off, LA, Lewis B. Gardner, Brown McCarroll & Oaks Hartline, Houston, TX, for Torch Operating Company.

James Louis Weiss, Gordon Arata, McCollam & Duplantis, New Orleans, LA, Loulan Joseph Pitre, Jr., Cut Off, LA, for Torch Operating Company's Severance Plan, Torch Operating Company's Limited Severance Pay Program for Employees Under Payroll Departments 300, 310, 320, 330, 410, 415, 430, 435, 440, 445, and 500.

Christopher L. Zaunbrecher, Briney & Foret, Lafayette, LA, for Patrick Monceaux.

## MEMORANDUM OPINION

FALLON, District Judge.

Plaintiffs are former employees of defendant Torch Operating Company who contest the level of payment of severance benefits following an asset sale of certain of defendant's facilities to another corporation and the termination of their employment. Both plaintiffs [1] and defendants Torch Operating Company, Torch Operating Company Severance Plan, and Torch Operating Company Limited Severance Pay Program for Employees Under Payroll Departments 300, 310, 330, 410, 415, 430, 435, 550, 445 and 500 agreed to submit the trial of this matter to the Court upon stipulated facts and briefs filed with the Court.[2] The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because plaintiffs claim a violation of the Employee Retirement Income Security Act (hereinafter "ERISA"), 29 U.S.C. § 1001, *et seq.* Specifically, plaintiffs bring this action pursuant to 29 U.S.C. § 1132,[3] seeking payment of severance benefits based on a method of determining such compensation previously used by

---

**1.** Plaintiffs in C.A. No. 94–692 are the lead plaintiff Whitfield and, listed in order of appearance as plaintiffs in the Complaint and Amended Complaint (R.Docs. 1 and 14), Richard R. Andrews Sr., Steve Andrews, James W. Arbogast Jr., Alan L. Babcock, Lonnie T. Barrow, Tommy J. Bergeron, Wayne C. Bergeron, Gerald J. Blanchard, Clifford J. Bonin, William Bourgeois, Edward Branch, Rocky L. Brandon, Bernie D. Broussard, James W. Bruyninckx, Cecil O. Bullock Jr., Weldon W. Butler Sr., Robert M. Clayton, Richard A. Collier, Darriell S. Collins, Huey O. Collins Jr., Arnold J. Crochet, James G. Cruse, Sherman Daniel, David W. Doughty, Silas B. Dufrene, Larry Dugas, Herman W. Duncan Sr., Daniel J. Dupre, Bertman J. Faul, Vernon Fletcher, John D. Foret, Vernon Fletcher, John D. Foret, Wayne Fournier, John S. Frisella Sr., Allen R. Garner, Gregory D. Gautreaux, Larry Michael Graffeo, John U. Hanks, Roger D. Hanks, Barry Harper, Gary L. Hatten, Alvin Hebert, Gary L. Henderson, Derrel J. Higgins, Herbert Himel Jr., Robert G. Humphries, Alfred Jackson, James W. Justice Jr., David E. Kimball, William E. Kinney, Sammie L. Kistler, Tom Landry, Cecil J. Lapeyrouse, Melvin J. Lebeouf, Hoyed R. Lee Jr., Leo P. Lewis, Daniel J. Lirette, Ennis Luke, Michael J. Luke, Wiltz J. Luke, Mark E. Lumpkin, Terry W. Lytle, Robert D. McCormick, Randall C. McCravy Sr., Paul E. McDowell, Carson J. McElroy, Dennis S. McNabb, Robert L. Macher, Celia L. Marse, Jerry L. Mason, James B. Menasco,

Harvey R. Moore, Larry Naquin, Warren J. Naquin Jr., Leland A. Neil, Nere H. Ourso, James G. Pellegrin, Scott Pellegrin, Silas S. Pellegrin Jr., Wilbert P. Peltier Jr., Robert R. Perry Jr., Eugene J. Pete, Terence J. Picou, Clifton L. Pierce, Thomas W. Powell, Richard Prejean, Jimmie Price, Murphy Renois, March A. Richard, Joe M. Rimer, Angelo Roberts, Danny Saffel, Thomas E. Sistrunk, Donald R. Smith, Maurice N. Smith, William W. Smith Jr. Earnest L. Spangler, Gary L. Stewart, Ronnie M. Sturm, Scott R. Usie, Gary W. Vail, Rocky L. Watson, Robert Wheeler Jr., Bobby J. Williams, Charles E. Wood, Billy D. Baker, Bryan C. Butcher, Matthew M. Chaisson, John B. Cross, Tally O. Dosier, Denver L. Guillory, Mark C. LaPoint, Alton V. Lawrence, Willis D. Lurry, Kevin A. Marie, Kenneth R. Powell, Narvin Powell Sr., Jerry J. Smith, Jeff Tatum Jr., Claude Triche, Sammie L. Kistler and Randy Chaumont. Plaintiff in C.A. No. 94–2430 is Patrick Monceaux. Plaintiff James M. Kyzar has dismissed all of his claims against defendants. (R.Doc. 72.)

**2.** R.Doc. 61.

**3.** This statute provides, in pertinent part:

A civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan....
29 U.S.C. § 1132(a)(1)(B).

TOC. For the reasons that follow, the Court finds that plaintiffs' position is legally unjustified and will enter judgment in favor of defendants and against plaintiffs.[4]

### Findings of Fact [5]

Torch Operating Company (hereinafter "TOC") purchased the assets of Placid Oil Company (hereinafter "Placid") and began operating those assets effective March 1, 1991. Plaintiffs are former Placid employees whose employment was terminated with Placid on that date and who simultaneously became TOC employees on that date.

In connection with the sale of its asset to TOC, Placid did not pay severance benefits to plaintiffs. Prior to the TOC asset purchase, Placid had occasionally paid severance benefits to its involuntarily terminated employees, and, when plaintiffs first learned of the TOC asset purchase, they did not expect to receive severance benefits from Placid if TOC hired them. Further, when TOC hired plaintiffs, it made no written or verbal statements or representations to plaintiffs as to severance pay.

Approximately one year later, in March 1992, TOC awarded severance benefits to twenty-eight TOC employees who were involuntarily terminated as a result of a TOC reorganization. J.P. Bryan, TOC's Chairman of the Board of Directors, made the decision to give these laid-off employees credit for their prior service with Placid in determining their severance benefits. Each of them was given letters on the date of their termination explaining the severance benefits payable.[6] The explanation included recognition of their previous employment dates with Placid.

Following this layoff, TOC never made any verbal or written statements to or representations to plaintiffs as to the calculation of severance benefits in the case of any future involuntary terminations. However, in a memorandum dated December 28, 1992 to TOC vice-president Ed Ferguson, TOC employee and secretary Cindy Bunch commemorated the March 1992 severance package. The memorandum read as follows:

> The severance package for Torch Operating Company employees is as follows:
>
> 1. ½ month [sic] salary for every year [sic] service with the company. (Placid's employment date)
>
> 2. 1 day [sic] pay for every month which does not complete a year.
>
> 3. Health & Dental insurance remain [sic] intact until severance is complete.[7]

In December 1992 TOC offered seven employees, presumably former Placid employees in Louisiana,[8] the option to transfer to its offices in Houston following the consolidation of job functions and told these employees that if they did not accept the transfer, their employment with TOC would be terminated. Initially, TOC management employees told these seven that they would not receive severance pay benefits if they did not accept a transfer to Houston. One of these employees then telephoned Bryan, urging him to provide the same package of severance benefits to the employees who did not want to transfer as provided to employees involuntarily terminated in March 1992. Bryan granted the request. Thereafter, five of the seven TOC employees did not accept the transfer and received severance benefits based on recognition of their employment date with Placid.

---

4. This decision constitutes the findings of fact and conclusions of law required under Fed. R.Civ.P. 52. To the extent that any conclusion of law is deemed to be a finding of fact, it is adopted as such, and, likewise, any finding of fact that is deemed to be a conclusion of law is so adopted.

5. As noted, the parties filed a "Joint Stipulation of Material Facts," (R.Doc. 64), and the Court's recitation of facts is taken from this document. The Court will not cite to each stipulated fact absent a quotation or another specified reason for doing so.

6. Copies of these letters as to one of the terminated employees are included in the record as Exh. F, "Joint Stipulation of Material Facts."

7. Exh. C, "Joint Stipulation of Material Facts." (R.Doc. 64.)

8. Although the stipulated facts do not specifically state that these seven employees were former Placid employees in Louisiana, the Court infers this fact from another stipulated fact, i.e., that a former Placid employee who accepted transfer was later terminated for cause. Id. ¶ p, p. 4.

Following this layoff, TOC again did not make any verbal or written representations or statements relating to the calculation of severance pay benefits for future involuntary terminations. It is also undisputed that neither the March 16, 1992, letter to the laid-off employees nor the documentation generated in connection with the 1993 termination of the five employees who refused transfer include any language as to the calculation of severance pay benefits for future involuntary terminations. At the same time, the parties agree that neither the letters nor the documentation included any provisions for modification or amendment of the method used by TOC to calculate severance pay on those two occasions.

Over the course of the period from 1991 to 1994, three former Placid employees were discharged for cause. Two received no severance pay. One, who was a former Placid employee who accepted a transfer to Houston, received severance benefits which took into account her Placid employment date.

In September 1993, TOC began discussions with Norcen Explorer, Inc. (hereinafter "Norcen"), as to the sale of former Placid facilities to Norcen. "When plaintiffs first heard of the potential asset sale to Norcen in September or October 1993, they expected to receive severance benefits based on their Placid and TOC time. Their expectation was based on the severance benefits paid in connection with the March 1992 and January 1993 layoffs."[9]

A vice president at TOC then had prepared a cost analysis in connection with the asset sale to Norcen, which compared the cost to TOC of paying severance benefits to the former Placid employees based upon TOC employment time only as opposed to a combination of TOC and Placid service. He presented this cost analysis to Bryan, who decided to award severance benefits to employees terminated as a result of the asset sale to Norcen based only on an employee's service with TOC. "He considered a variety of factors in making his decision, including the facts that the employment termination at issue was the result of an asset sale rather than a reduction in force, that the employees involved had been given notice as early as September or October 1993 of an impending sale to Norcen (whereas employees laid off on two previous occasions had little or no notice), and relative cost."[10]

This "Severance Package," as referred to by the parties,[11] became effective on December 1, 1993, and by its terms applies to employees terminated in connection with the sale of assets to Norcen.[12] The Severance Package also included a "Separation Agreement and Release of Claims Form," which provided that all employees would waive any claims under ERISA against TOC, its parent company or any of its affiliates or successors.[13] Further, the separation agreement provided: "This Agreement contains the entire agreement between Employee and [TOC] and fully supersedes any and all prior agreements, obligations, or understandings pertaining to the subject matter hereof."[14]

In a letter dated December 30, 1993, one of TOC's vice presidents—the same vice president to whom the TOC secretary had written the memorandum memorializing the March 1992 severance package—wrote to the former Placid employees notifying them of the implementation and adoption of the Severance Package and providing a copy of the package and the release agreement, which is part of the Severance Package according to the stipulated facts.[15] In line with Bryan's decision, the Severance Package only calculated severance benefits based upon service with TOC, not TOC and Placid.

The asset sale to Norcen was consummated, and, as a result, plaintiffs' employment with TOC terminated on March 4, 1994, with

9. *Id.,* ¶ q, p. 4.

10. *Id.,* ¶ s, p. 5.

11. *Id.,* ¶ t, p. 5.

12. *Id.* and Exh. E, "Joint Stipulation of Material Facts."

13. Exh. E, "Separation Agreement and Release of Claims," ¶ 1.

14. *Id.,* ¶ 3.

15. ¶ t, p. 5, "Joint Stipulation of Material Facts." (R.Doc. 64.)

the exception of two plaintiffs whose employment was terminated shortly thereafter but nevertheless were covered by the Severance Package.

In early 1994 numerous—but not all—of the plaintiffs filed claims with TOC through plaintiffs' attorney contesting the exclusion of Placid service from their severance benefits, basing their claim on the severance benefits offered previously in March 1992 and January 1993.

Certain of the plaintiffs executed the release attached to the Severance Package and have received severance benefits from TOC under the Severance Package.[16] Plaintiff Kistler also signed the release and was paid benefits; but in a letter dated October 10, 1994, he advised TOC of his intent to revoke the release and tendered the severance benefits back to TOC, which declined to accept them.

Plaintiff McNabb obtained long-term disability status on February 21, 1994, and since that time has received long-term disability payments from TOC.

Finally, the Court notes several other undisputed facts that do not fit within the foregoing chronology but which the parties list. First, attached as Exh. A to the "Joint Stipulation of Material Facts" are several employee handbooks and benefit booklets applicable to plaintiffs during their employment with TOC, though none specifically mention severance benefits. In each TOC reserves the right to alter or discontinue any one, several or all of its benefits and services at any time.

Second, at all times between March 1, 1991, and March 4, 1994, TOC recognized plaintiffs' employment date with Placid in the calculation and distribution of benefits under TOC's long-term disability plan and vacation policy. Further, TOC expressly recognized March 1, 1988, as the date for determination of plaintiffs' vesting rights under TOC's pension and thrift plans.

Third, plaintiffs exhausted whatever administrative remedies were available to them prior to institution of this action. Fourth, certain of the plaintiffs were re-employed after the asset purchase by Norcen or its independent contractor, Seahawk Services, Ltd., and a list of those employees is attached as Exhibit G to the "Joint Stipulation of Material Facts." This exhibit also lists the plaintiffs, their Placid employment date, their annual pay, the severance benefits payable using only plaintiffs' TOC employment dates and the benefits payable using plaintiffs' Placid employment dates.

Fifth, and finally, the parties attach as Exh. H to the "Joint Stipulation of Material Facts" the pertinent portions of the purchase and sales documents between Placid and TOC and state: "TOC did not intend to assume or create any obligation to pay severance benefits to former Placid employees re-employed by TOC."[17]

### Conclusions of Law

#### I. Existence of Severance Plan

The initial question is whether a severance plan existed prior to the Severance Package. Such a determination entails a brief analysis of elementary principles of ERISA followed by a review of the law as to determination of whether a plan exists in this instance under ERISA when it is not formally written. Plaintiffs insist that despite the lack of a written plan, TOC maintained an informal severance plan subject to ERISA's requirements prior to the Severance Package. Defendants submit that no such plan existed.

"ERISA applies to any employee benefit plan if it is established or maintained by an employer or an employee organization engaged in commerce or in any industry or activity affecting commerce." *Memorial Hospital System v. Northbrook Life Insurance Company*, 904 F.2d 236, 240 (5th Cir. 1990). ERISA regulates both pension plans

---

**16.** These are: Bullock, Butler, Himel, Kinney, Moore, Ourso, Kenneth R. Powell, Saffel and Donald R. Smith.

**17.** ¶ ff, p. 8, "Joint Stipulation of Material Facts." (R.Doc. 64.) The parties also have stipulated that "[i]f a final, nonappealable judgment

is entered in defendants' favor," plaintiffs have forty-five days in which to sign waivers and releases in exchange for which TOC will pay severance benefits based on their TOC hire date. *Id.*, ¶ dd, p. 7. However, this last stipulation is not relevant to the Court's ruling.

and welfare plans. *Id.* Severance plans qualify as welfare plans. *Massachusetts v. Morash,* 490 U.S. 107, 114 and n. 8, 109 S.Ct. 1668, 1672 and n. 8, 104 L.Ed.2d 98 (1989), citing 29 U.S.C. *Id.,* citing 29 U.S.C. § 1002(1) and 29 U.S.C. § 186(c)(6). *See also J.R. Whittemore v. Schlumberger Technology Corp.,* 976 F.2d 922, 923 (5th Cir. 1992).

■ In order to determine if ERISA is applicable in this case, the Court must first decide whether TOC established and maintained an unwritten severance plan prior to the existence of the Severance Package. The Fifth Circuit has adopted the Eleventh Circuit's test for determination of whether an ERISA plan has been established informally.

[A]n ERISA plan is established "if from the surrounding circumstances a reasonable person can ascertain the intended benefits, a class of beneficiaries, the source of financing, and procedures for receiving benefits." *Donovan v. Dillingham,* 688 F.2d 1367, 1373 (11th Cir.1982) (*en banc*). A formal document designated as "the Plan" is not required to establish that an ERISA plan exists; otherwise employees could avoid federal regulation merely by failing to memorialize their employee benefit programs in a separate document so designated.

*Memorial Hospital,* 904 F.2d at 240–41 (footnotes omitted).

■ Applying this test to the stipulated facts, the Court finds that an unwritten welfare plan existed at TOC as to involuntarily terminated employees that took into account their Placid employment date. In two instances prior to plaintiffs' termination, TOC provided benefits to employees terminated involuntarily, once in March 1992 and again in January 1993. This establishes the intended beneficiaries. The payment of severance benefits based on both TOC and Placid employment coupled with the memorialization of this informal welfare plan in an informal memorandum to a company vice president following the March 1992 terminations proves the intended benefits. Finally, the source of financing and procedures for receiving benefits are also gleaned from the prior terminations. TOC paid these benefits, and the procedure for their receipt was, at most, no more than a simple request by the involuntarily terminated employees. Clearly, then, TOC established an unwritten plan to provide severance benefits to involuntarily terminated employees under the applicable law.

TOC's argument that the March 1992 and January 1993 decisions to provide severance benefits based on TOC and Placid service were *ad hoc* decisions is undercut by the memorialization of the benefits provided in 1992 and TOC's decision to abide by this benefit package in 1993 after its chairman was reminded of the benefits paid in 1992 to involuntarily discharged employees.

TOC also maintains that Bryan's decision not to award plaintiffs severance benefits under the informally adopted plan because they knew of the asset sale and because they were being terminated as part of an asset sale, rather than a reorganization, is evidence of the *ad hoc* nature of the severance benefits. This contention has no merit. The memorialization of the informal plan does not require a lack of notice before severance payments are made and does not differentiate between employees terminated due to an asset sale and those terminated due to reorganization. Indeed, the facts show that severance benefits were even paid to one employee discharged for cause, a situation completely outside the realm of either a reorganization or an asset sale. TOC further argues that the fact that Bryan took into account relative cost in his decision not to award plaintiffs' severance benefits under the informal plan makes this a one-of-a-kind situation. However, once again, as memorialized in the 1992 memorandum, the informal plan does not list cost as a factor to be taken into consideration before severance benefits are paid. The simplicity of the informal plan as set forth in the December 1992 memorandum clearly supports the Court's determination that an informal plan for severance benefits existed at TOC.

TOC next contends that because the severance payments in March 1992 and January 1993 were made in one lump sum on each occasion and did not require ongoing over-

sight or administration, no severance benefits plan existed for ERISA purposes, relying on *Wells v. General Motors*, 881 F.2d 166, 175–76 (5th Cir.1989). However, *Wells* is distinguishable. *Wells* involved a one-time, lump-sum payment for employees who ceased working at a plant. *Id.* at 176. "The plan was not ongoing, nor was there any need for continuing administration of the payment program (though employees could elect a two-year installment payment option)." *Id.* The Fifth Circuit concluded that "[t]he fact that GM made the payments pursuant to a Voluntary Termination of Employment '*Plan*' and that the employees received a benefit [did] not convert the plan into an 'employee benefit plan' for the purposes of ERISA." *Id.*

In the present case, unlike *Wells,* the stipulated facts prove that some administration of the severance benefits was required. According to one of the letters entered into evidence as to March 1992 layoffs, the payments were to be payable on the employees' semi-monthly pay periods.[18] This certainly would have required some type of ongoing accounting or clerical administration. Additionally, as in *Whittemore, supra,* the TOC plan was not created with a particular layoff in mind, as in *Wells,* but had been in existence for some time. *See Whittemore,* 976 F.2d at 923 ("Schlumberger's plan ... was not created with a particular closing in mind and had been in existence for some time.") Finally, the Court finds *Wells* inapposite because the decision there was made in the context of determining whether ERISA preempted plaintiffs' claim, not in the context of determination of whether an informal plan existed. *See Wells,* 881 F.2d at 176.

In conclusion as to the first issue, the Court holds that an ERISA plan existed at TOC for severance benefits which would be payable to involuntarily terminated employees on the basis of both their Placid service time and their TOC employment time.

**II. Validity and Effect of Amendment of Plan**

Having determined that an unwritten, informal severance plan existed prior to estab-

lishment of the "Severance Package," the next issue is whether the adoption of the "Severance Package" validly amended the informal plan. Once again, this analysis entails a preliminary review of standard ERISA principles followed by an examination of the present state of the law as to the precise question.

■ Welfare benefits, such as severance payments, are not subject to "strict vesting, accrual, participation and minimum funding requirements that ERISA imposes on pension plans." *Wise v. El Paso Natural Gas Co.,* 986 F.2d 929, 935 (5th Cir.1993). As a result, ERISA does not prohibit a company from amending or eliminating previously offered benefits that are neither vested nor accrued. *Id. See also Curtiss–Wright Corporation v. Schoonejongen,* —— U.S. ——, ——, 115 S.Ct. 1223, 1228, 131 L.Ed.2d 94 (1995) (citing *Adams v. Avondale Industries, Inc.,* 905 F.2d 943, 947 (6th Cir.1990)). Yet, TOC's right to amend its plan at any time does not provide a simple answer to the legal issue growing out of the instant facts where there existed an informal plan that did not meet any of the reporting and disclosure or fiduciary requirements of ERISA. *See* 29 U.S.C. §§ 1021–31, 1101–1114.

Plaintiffs' initial position is that, because TOC flouted these requirements so much, any amendment of the informal plan is invalid pursuant to *Blau v. Del Monte Corporation,* 748 F.2d 1348 (9th Cir.1985). However, the Court finds *Blau* distinguishable because the plaintiffs in *Blau,* unlike the plaintiffs here, did not know of the existence of a written plan for severance pay until after the lawsuit was filed. *Id.* at 1351. Although there is no evidence in the record that TOC provided plaintiffs with a copy of the plan at issue, informal as it was, or met any of the fiduciary requirements, the Court does not find that TOC actively concealed the plan to the extent found in *Blau,* necessitating invalidation of any plan revision. On the contrary, the facts indicate that plaintiffs knew of the existence of the informal plan at least as early as September or October 1993, if not before. As to the amendment of the plan,

---

**18.** Exh. B., "Joint Stipulation of Material Facts."

the stipulated facts show that plaintiffs received notice of the "Severance Package" within 30 to 60 days of its adoption, well within the 210–day limit as established by 29 U.S.C. §§ 1022(a)(1) and 1024(b)(1).[19]

Thus, the Court is left with the issue of whether the amendment that resulted in the "Severance Package" was valid because the informal plan did not meet any of the reporting and disclosure requirements and, in a fiduciary context, did not contain a procedure for amending the plan or a procedure for identifying persons with authority to amend the plan, as required by 29 U.S.C. § 1102(b)(3).[20]

█ The Fifth Circuit has directly addressed the question of when a plan amendment may be invalidated when the plan fails to meet the reporting and disclosure requirements of ERISA. Failure to provide notice of an amendment is a procedural violation of ERISA and does not invalidate the amendment "unless the beneficiary can show active concealment of the amendment, or 'some significant reliance upon, or possible prejudice flowing from'" the procedural violation. *Godwin v. Sun Life Assurance Company of Canada*, 980 F.2d 323, 328 (5th Cir.1992) (citations and footnotes omitted). *See also Williams*, 48 F.3d at 926. As shown above, the plaintiffs cannot show active concealment of the amendment.

Before addressing whether plaintiffs have shown reliance or prejudice from the procedural violations of lack of reporting and disclosure, the Court pauses to determine the standard for determining whether violation of the fiduciary responsibilities under ERISA, specifically § 1102(b)(3), invalidate an amendment to a welfare benefit plan such as existed here. The reason for this digression is that, as will be seen, several courts have found that plaintiffs must prove concealment or reliance/prejudice to invalidate an amendment when ERISA's fiduciary requirements are violated, similar to the burden of proof set down in *Godwin* for violation of reporting and disclosure requirements.

The Fifth Circuit has not directly confronted this issue,[21] and there is a disagreement between the Third Circuit and other circuits which have considered the question. In *Schoonejongen v. Curtiss–Wright Corporation*, 18 F.3d 1034, 1040 (1994), *rev'd on other grounds*, ── U.S. ──, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995), the Third Circuit held that where there are no amendment procedures as required by § 1102(b)(3) set forth in a plan, any amendment is ineffective. "To hold otherwise would place those who violate [§ 1102(b)(3) ] by including no procedure for amendment in a plan in a better position than those who comply with that requirement and would thereby discourage employ-

**19.** The Court notes that plaintiffs also insist that the "Severance Package" was not an amendment of an informal plan but instead adoption of a new benefit package. Hence, plaintiffs contend that they are covered under both the informal severance plan and the "Severance Package." This contention is easily dismissed, however, for the facts undercut this position. The "Severance Package" included a waiver/release, which albeit indirectly, references the prior informal plan. *See* Exh. E. The release states, in pertinent part, that the employee agrees to release TOC from "any and all claims to *different or additional* severance benefits, severance and termination pay." The Court finds that this reference to the informal plan proves that the "Severance Package" is actually an amendment of the informal plan.

**20.** This statute reads: "Every employee benefit plan shall … provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan...." 29 U.S.C. § 1102(b)(3).

**21.** It is true that in *Williams v. Plumbers & Steamfitters Local 60 Pension Plan*, 48 F.3d 923, 926 (5th Cir.1995), a panel stated that "only an amendment executed in accordance with the [a plan's] own procedures and properly noticed could change [a plan]," citing *Confers v. Custom Eng'g Co.*, 952 F.2d 41, 43 (5th Cir.1991). However, *Williams'* generalized statement is not instructive as to the precise issue at hand. The issue in *Williams* was appellant's claim "that the amendment was not effective because it was never formally adopted into the Plan," *id.*, not whether a plan could be amended absent procedures for amending the plan and the identity of the person who could make the amendment as required by § 1102(b)(3). This conclusion is supported by a review of *Confers*, where the issue was specifically whether a plan could be amended orally or informally, not whether a plan could be amended at all if it failed to comply with § 1102(b)(3). *Confers*, 952 F.2d at 43.

ers from complying with [§ 1102(b)(3) ]." *Id.*[22]

Other circuits have refused to impose such a stringent remedy for failure to follow § 1102(b)(3). For example, the Seventh Circuit held that failure to comply with § 1102(b)(3) does not invalidate an amendment "absent a showing of bad faith, active concealment or detrimental reliance"; such a legal burden ensures that a breach of § 1102(b)(3) allows recovery only where the breach defeats "an employee's legitimate expectation of a benefits." *Murphy v. Keystone Steel & Wire Company, Division of Keystone Consolidated Industries, Incorporated,* 61 F.3d 560, 569 (7th Cir.1995). *See also Aldridge v. Lily–Tulip, Inc. Sal. Ret. Plan Ben.,* 40 F.3d 1202, 1211–12 (11th Cir. 1994); *Biggers v. Wittek Indus., Inc.,* 4 F.3d 291, 295–96 (4th Cir.1993); *Adams v. Avondale,* 905 F.2d 943, 949 (6th Cir.1990).

*Adams* is particularly instructive because the only material difference between *Adams* and the instant case is that in *Adams* the parties stipulated that an informal, unwritten severance existed with specific terms. *Id.* at 945–46. Otherwise, the facts here virtually track those of *Adams.* Plaintiffs there had been employed by Avondale Industries, which sold the assets of a division to a wholly unrelated entity. *Id.* at 944. Plaintiffs claimed that they were entitled to severance benefits under the unwritten severance plan, but Avondale contended, *inter alia,* that the severance plan had been amended, "reduced to writing" and distributed to some but not all employees. *Id.* Per the amendment, Avondale argued that the plaintiffs were not entitled to benefits. *Id.* at 945.

After recognizing the general principle that welfare benefit plans such as severance plans can be established, amended or terminated at any time, *id.* at 946–49, the Sixth Circuit found that Congress did not intend that failure to comply with § 1102(b) would, "for that reason alone," make a plan unamendable. *Id.* at 949. Instead, plaintiffs would have to prove "detrimental reliance based on the defendant's failure to comply

with section 1102(b)." *Id.* Because plaintiffs did not show this reliance, the Sixth Circuit declined to "impose the substantive remedy of prohibiting plan amendment in response to defendant's procedural violations." *Id.,* citing *Blau, supra.*

■ After reviewing the foregoing cases, the Court holds that the decisions and reasoning of the Fourth, Sixth, Seventh and Eleventh Circuits are more persuasive and more properly construe ERISA in accord with its purposes than the Third Circuit's all-or-nothing stand in *Schoonejongen.* The requirement that beneficiaries of a welfare benefit plan show active concealment, reliance to their detriment or substantial prejudice before a court may invalidate an amendment to a welfare benefit plan serves the dual purpose of protecting the rights of beneficiaries to the plan while allowing flexibility to the plans to grow or diminish at any time, as allowed by law. On the other hand, the Third Circuit's position is too narrow and leaves a plan that fails to comply with fiduciary requirements such as § 1102(b)(3) forever mired in the static position of being unamendable. This is contrary to the well-established rule that welfare benefit plans are not subject to strict vesting or accrual and may be amended or abolished at any time. *See Schoonejongen,* —— U.S. at ——, 115 S.Ct. at 1228; *Wise,* 986 F.2d at 935. Therefore, the Court holds that in order for plaintiffs to invalidate the amendment that resulted in the "Severance Package," they must prove by a preponderance of the evidence active concealment or detrimental reliance/prejudice. Because this is the same standard established in *Godwin, supra,* for invalidating an amendment when a plan fails to meet ERISA's reporting and disclosure requirements, the Court weighs the evidence according to *Godwin's* teaching.

■ Plaintiffs maintain that TOC actively concealed the informal plan, but the facts belie this contention. TOC offered the informal severance benefits to its employees in March 1992 and January 1993, and the stipu-

---

**22.** This portion of the Third Circuit's opinion in *Schoonejongen* was not expressly overruled by the Supreme Court, as recognized by a later Third Circuit decision. *Ackerman v. Warnaco, Inc.,* 55 F.3d 117, 125, n. 8 (1995).

lated facts show that plaintiffs were aware of its existence. Indeed, when they first heard of the potential asset sale to Norcen in the fall of 1993, "they expected to receive benefits" based on the informal plan. The release that is a part of the Severance Package also is not indicative of concealment, as plaintiffs contend, for the release acknowledges the informal plan through implication when it requires waiver of any rights under any "additional or different" severance plans.[23]

Plaintiffs also have not proven reliance upon the informal plan to their detriment or prejudice from TOC's failure to comply with either notice or its fiduciary responsibilities. As mentioned briefly in the prior paragraph, the "Joint Stipulation of Material Facts" states:

> When Plaintiffs first heard of the potential asset sale to Norcen in September or October 1993, they expected to receive severance benefits based on their Placid and TOC time. This expectation was based on the severance benefits paid in connection with the March 1992 and January 1993 benefits.[24]

This seems to establish degree of reliance. However, analysis of *Govoni v. Bricklayers, Masons & Plasterers International Union of America, Local No. 5 Pension Fund,* 732 F.2d 250, 252 (1st Cir.1984), upon which *Godwin* relies for the reliance/prejudice doctrine, *Godwin,* 980 F.2d at 328, reveals that more than just mere reliance is necessary. There must be reliance to the detriment or prejudice of the plaintiffs.[25] For example, in *Govoni,* plaintiff complained about failure of the plan description to reveal that those with breaks in employment service prior to 1976 would be treated more harshly as to pension benefits than those with breaks after 1976. *Govoni,* 732 F.2d at 252. The First Circuit found no reliance on the new plan because "[w]hen the plan was amended Govoni had already lost his past service credit, according to the terms of properly publicized rules." *Id.* As a result, "[w]hat he believed or did

not believe about the new rules could not affect his previous actions." *Id.* In *Hillis v. Waukesha Title Co., Inc.,* 576 F.Supp. 1103, 1109–1110 (E.D.Wis.1983)—cited by *Govoni* in support of the reliance doctrine, 732 F.2d at 252—the plaintiff testified that had he known of the existence of pension benefits and its terms, he would have avoided the risk of forfeiture of the benefits through resignation. *See also Henne v. Allis Chalmers Corporation,* 660 F.Supp. 1464, 1474–75 (E.D.Wis.1987) ("[E]ven if ... employees had know about the deleted phrase and the possible reduction in their severance benefits, their only choices would have been to terminate their employment voluntarily or to refuse to accept employment" with purchasing company, which would have rendered them ineligible under the severance plan).

In this case, although plaintiffs expected to receive benefits under the informal plan, there was no reliance to their detriment because there is no evidence that they would have acted or done anything differently as in *Hillis.* Indeed, as in *Henne,* plaintiffs' only choice would have been to resign prior to the sale to Norcen, which under the informal plan would have rendered them ineligible for any severance benefits because they would not have been involuntarily terminated. In conclusion, the evidence shows that, while plaintiffs relied on the informal plan, they took no action in reliance on the plan to their detriment or prejudice.

In summary, because plaintiffs have not proven active concealment or reliance to their detriment/prejudice from the amendment to the informal plan, the amendment that resulted in the "Severance Package" is valid.

### III. Standard of Review

Having made the foregoing determination, resolution of the final issue—whether TOC properly denied plaintiffs' request for sever-

---

23. Exh. F, "Joint Stipulation of Material Facts."

24. ¶ q, "Joint Stipulation of Material Facts."

25. For purposes of clarity, the Court notes that in speaking of reliance to the detriment of plaintiffs the Court is not referring to the civilian

doctrine of detrimental reliance under Louisiana law, *see* LSA–C.C. Art.1967, but to the doctrine as described in *Godwin* and other decisions construing ERISA. *See Keystone, supra,* and cases cited therein.

ance benefits under the pre-amended, informal plan—is simple. The Court reviews TOC's denial under a *de novo* standard, not an arbitrary and capricious standard, because the severance plan at hand, even as amended, did not give the administrator or fiduciary discretionary authority to construe the terms of the plan. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). Even under this heightened standard, the Court finds that TOC rightfully denied plaintiffs benefits under the informal, unwritten plan because it had been validly amended to deny plaintiffs severance benefits based on both their TOC employment time and their service with Placid.[26]

## IV. Conclusion

The stipulated facts establish that TOC put into effect an informal, unwritten welfare benefits plan for severance payments. Once established, TOC had the right to amend its plan at any time. Further, the amendment of the plan that resulted in the Severance Package was valid even though there was a failure to comply with the reporting and disclosure requirements of ERISA because plaintiffs failed to prove either active concealment of the plan or its amendments or reliance to their detriment or substantial prejudice. Therefore, TOC was legally justified in denying severance benefits to plaintiffs based on their employment service with TOC and Placid, their prior employer.

Accordingly,

IT IS ORDERED that judgment be entered in favor of defendants and against plaintiffs, dismissing plaintiffs' complaint, as amended, with prejudice, with costs assessed against plaintiffs and in favor of defendants.

---

26. In view of the Court's conclusions, the Court does not reach the remaining issues raised by the parties, *i.e.,* whether any of plaintiffs who were reemployed by Norcen immediately after the sale are entitled to severance benefits and whether any employees who signed releases and/or are on disability are entitled to severance benefits.